**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RASHIAD SNEAD, | : | Civil No. 1:19-CV-0841 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| M. STEIF, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Plaintiff Rashiad Snead ("Snead" or "Plaintiff"), a self-represented federal prisoner, filed this civil rights action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), after Defendant M. Steif ("Steif") allegedly called him "a rat" in front of other inmates and staff, and then tried to provoke a physical altercation with him. Snead also claims that Defendants Scott Finley, R.A. Perdue, Robert Schreffler, Thomas Reisinger, Jared Sensenig, Suzanne Brown, and Ian Connors ("Government Defendants" or "Defendants") failed to intervene, report, or investigate his complaint against Steif, or protect him from Steif's continued retaliatory harassment. (Doc. 36.) Presently before the court is the Government Defendants' motion to dismiss, or in the alternative, for summary judgment.[1] (Doc. 55.) The Government Defendants

---

[1] The Government Defendants and Steif are represented by separate counsel. Also pending before the court is Steif's separate motion to dismiss, or in the alternative, for summary judgment, Doc. 57, which is addressed under separate cover.

argue, inter alia, that Snead's official capacity claims against them are barred by the doctrine of sovereign immunity, his claims against them are unexhausted, he fails to allege their personal involvement in his amended complaint, and his claim for compensatory damages is barred due to his lack of physical injury. (*Id.*) For the reasons set forth below, the court concludes that Government Defendants are entitled to summary judgment because Snead failed to exhaust his available administrative remedies against them. As a consequence of this finding, Snead's failure to protect claim against Steif is the sole remaining claim in this matter.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Snead initiated this matter by filing a complaint on May 9, 2019. (Doc. 1.) After paying the filing fee, Snead sought allowance to file an amended complaint on July 3, 2019, and the court granted that request on July 29, 2019. (Docs. 18, 26.) Snead's amended complaint, the operative pleading in this matter, was filed on October 17, 2019. (Doc. 36.) After receiving an enlargement of time to respond to the amended complaint, Defendant Steif and the Government Defendants filed separate motions to dismiss, or in the alternative, for summary judgment. (Docs. 55, 57.) Snead filed his opposition briefs in April 2020. (Docs.

---

[2] Plaintiff does not dispute the Government Defendants' Statement of Material Facts. (*Compare* Docs. 61 and Doc. 69-1, pp. 1–2, ¶¶ 1–20.)

68, 69.) Defendants did not file reply briefs. Both motions are accordingly ripe for the court's review.

## A. The Bureau of Prisons' Administrative Remedy Process

The Bureau of Prisons ("BOP") Administrative Remedy Program allows an inmate to seek formal review of an issue relating to any aspect of his confinement. 28 C.F.R. § 542.10(a). Before seeking formal review, an inmate must first attempt to resolve the matter informally by presenting his complaint via an informal resolution attempt form, known as a BP-8. *See* 28 C.F.R. § 542.13(a). If informal resolution is unsuccessful, the inmate may then present the issue to the warden via a request for administrative remedy, referred to as a BP-9.[3] *See* 28 C.F.R. § 542.14. Generally, the warden must file a response within twenty calendar days. *See* 28 C.F.R. § 542.18. If a request is determined to be of an emergency nature which threatens the inmate's immediate health or welfare, the warden shall respond no later than the third calendar day after filing. *Id.* The inmate may file a BP-10, a regional administrative remedy appeal, to the appropriate regional director within twenty days of the warden's response if dissatisfied with the warden's response. *See* 28 C.F.R. § 542.15(a). If the regional director's response is not satisfactory, the inmate may file a central office administrative remedy

---

[3] An exception is made for appeals of disciplinary hearing officer decisions, which are raised directly to the regional director, rather than the warden, and then to the central office level. *See* 28 C.F.R. § 542.15(d).

appeal, referred to as a BP-11, within thirty days of the regional director's response.  *See* 28 C.F.R. § 542.15(a).  An inmate's appeal to the central office is the final administrative level of appeal in the BOP.  *See* 28 C.F.R. § 542.14(b).  An administrative remedy appeal is not complete, or fully exhausted, until reviewed by the BOP's central office.  (Doc. 61-1, Lavelle Decl., ¶¶ 4–10.)

The BOP's Administrative Remedy Program also provides an alternative procedure for an inmate who "reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution."  *See* 28 C.F.R. § 542.14(d).  In such a case, the inmate is permitted to submit an administrative remedy request directly to the regional director.  (*Id*.)  The request must be clearly marked "Sensitive" and include a written explanation for why it was submitted at the institutional level.  (*Id*.)  If the regional administrative remedy coordinator agrees that the request is sensitive, it will be accepted for action at the regional level.  (*Id.*)  If the coordinator does not agree, the inmate is advised in writing that the request has not been accepted and that he may pursue the matter by resubmitting it at the institutional level.  In that case, the request itself is not returned.  (*Id*.)

### B. Snead's Relevant Administrative Remedy Filings

Between July 29, 2017 (the date of the alleged incident) and May 15, 2019 (the date Snead filed his complaint), Snead only exhausted one administrative

remedy ("AR"), namely AR913287-A1, to the BOP's central office. This grievance concerned "unprofessional, inappropriate conduct by staff." (Doc. 61, ¶ 1; Doc. 61-1, pp. 7–8;[4] Doc. 69-1, ¶ 1.) Specifically, Snead asserted that on July 29, 2017, "M. Steif called [him] a punk ass rat bitch in front of staff member J. Sensenig and inmates, then attempted to coerce [him] into a physical altercation." (Doc. 61-1, p. 16.) As a result of Steif's actions, Snead alleges he is "now looked at as a snitch, a rat, etc. amongst the inmate population." (*Id.*; Doc. 61, ¶ 2; Doc. 69-1, ¶ 2.) Snead complained that Steif's conduct violated the BOP's policy governing employee conduct and asked that Steif be fired from his employment with the BOP. (Doc. 61, ¶ 3; Doc. 69-1, ¶ 3.)

Warden Perdue responded to AR913287-F1 on August 25, 2017, stating that Snead's complaint had been forwarded to the Special Investigative Supervisor ("SIS") for investigation, but that Snead would not be informed of the results. (Doc. 61-1, p. 15; Doc. 61, ¶ 4; Doc. 69-1, ¶ 4.) Snead filed a timely appeal of the Warden's response to the regional office, AR913287-R1, claiming that Steif was deliberately indifferent to his safety in violation of the Eighth Amendment when he placed him at risk of harm on July 29, 2017, by calling him a rat and snitch in front of other inmates. (Doc. 61-1, p. 14; Doc. 61, ¶ 5; Doc. 69-1, ¶ 5.) In his appeal he

---

[4] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

states that "for Eighth Amendment purposes, it is irrel[e]vant that no harm has befell" him following Steif's statements.  (Doc. 61-1, p. 14.)  On October 10, 2017, the regional director denied AR913287-R1 and advised Snead that his complaint was referred for review in accordance with Program Statement 3420.11, *Standards of Employee Conduct*, but the results of the review would not be disclosed to him. (Doc. 61-13, p. 1; Doc. 61, ¶ 6; Doc. 69-1, ¶ 6.)  Snead appealed the regional director's denial by submitting AR913287-A1 to the central office.  (Doc. 61-1, p. 10; Doc. 61, ¶ 7; Doc. 69-1, ¶ 7.)  Defendant Connors responded to AR913287-A1 on November 30, 2017.  He concurred with the Warden and Regional Director's response and that Snead's allegations were referred for review, but stated that inmates are not entitled to learn of the results of their complaints against staff. (Doc. 61-1, p. 9; Doc. 61, ¶ 8; Doc. 69-1, ¶ 8.)  Snead did not exhaust any additional administrative remedies concerning the claims asserted in his complaint against Government Defendants.  (Doc. 61-1, p. 4, Lavelle Decl. ¶ 12; Doc. 61, ¶ 9; Doc. 69-1, ¶ 9.)

### C. Office of Internal Affairs Investigative Report 2017-06083[5]

On August 11, 2017, after Snead filed an Informal Resolution Attempt Form with his Counselor, Warden Perdue reported the allegations of staff misconduct to

---

[5] This document is sealed.

the Office of Internal Affairs ("OIA"). (Doc. 66; Doc. 61, ¶ 10; Doc. 69-1, ¶ 10.)

SIS Reisinger conducted the investigation which included interviews of

Defendants Brown and Sensenig, as well as inmates. (Doc. 66; Doc. 61, ¶ 11; Doc.

69-1, ¶ 11.) Defendant Sensenig reported he was standing by the door to the

dining hall on July 29, 2017, when he saw and heard Snead and Steif yelling at

each other. He could tell it was "serious" because both seemed agitated. (Doc. 66,

pp. 2–3; Doc. 61, ¶ 12; Doc. 69-1, ¶ 12.) Defendant Sensenig reported hearing

Steif call Snead a rat, pussy, snitch, and a punk ass, but did not see Steif put his

crotch in Snead's face. (Doc. 66, p. 3; Doc. 61, ¶ 13; Doc. 69-1, ¶ 13.) Defendant

Sensenig reported that when he asked Snead what happened, he said it was all

because Snead did not get some inmates soda. (Doc. 66, p. 3; Doc. 61, ¶ 14; Doc.

69-1, ¶ 14.) Defendant Sensenig reported he then instructed Snead to go to the

dining room and then released him during the next inmate move. (Doc. 66, p. 3;

Doc. 61, ¶ 15; Doc. 69-1, ¶ 15.) Defendant Sensenig reported that as Snead left the

dining hall, Steif yelled, "That's right get the fuck out." (Doc. 66, p. 3; Doc. 61, ¶

16; Doc. 69-1, ¶ 16.) Defendant Sensenig also reported that Steif said he twice

apologized to Snead. (Doc. 66, p. 3; Doc. 61, ¶ 17; Doc. 69-1, ¶ 17.) Food Service

Administrator Suzanne Brown reported that she did not see the altercation between

Snead and Steif, but when Snead informed her that he intended to write Steif up for

the incident, she told him about the administrative remedy process. (Doc. 66, p. 3;

Doc. 61, ¶ 18; Doc. 69-1, ¶ 18.)  Defendant Brown reported that in January 2018,

Defendant Sensenig told her that he witnessed a verbal confrontation between

Snead and Steif, at which time she advised Sensenig to report the information to

SIS.  (Doc. 66, p. 3.)[6]  The investigation conducted by Defendant Reisinger

contained enough information to sustain the allegations against Steif for

threatening an inmate, verbal abuse, and unprofessional misconduct.  (Doc. 66, p.

4; Doc. 61, ¶ 20; Doc. 69-1, ¶ 20.)  The investigation concluded on July 11, 2018.

(Doc. 66, p. 1.)

## JURISDICTION

This court has jurisdiction over Snead's action pursuant to 28 U.S.C. § 1331,

which allows a district court to exercise subject matter jurisdiction in civil cases

arising under the Constitution, laws, or treaties of the United States.

## STANDARDS OF REVIEW

### A. Motion to Dismiss

In order "[t]o survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[6] Defendant Brown states that, while speaking to Defendant Sensenig, she advised "Steif to report the information to SIS."  (Doc. 61, ¶ 19.)  Snead did not dispute this fact.  (*See* Doc. 69-1, ¶ 19.)  Nonetheless, the court believes this statement contains a typographical error, as the investigative report cited by Government Defendants notes that Defendant Brown "advised Sensenig to report this to the SIS Office" not Steif.  (*See* Doc. 66, p. 3.)

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79). To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

## B. Motion for Summary Judgment

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for the grant of summary judgment. Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law and "genuine" only if there is a sufficient

evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23.

"Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## DISCUSSION

The court will first address the Government Defendants' administrative exhaustion argument. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), "mandates that an inmate exhaust such administrative remedies as are available before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1854–55 (2016) (quotation omitted). The "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA's mandatory exhaustion requirement is not fulfilled unless the inmate properly complies with all of the agency's deadlines and other procedural rules pertaining to its administrative remedy process. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020). It is the "'prison['s] grievance procedures [that] supply the yardstick' for determining what steps are required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (quoting *Spruill v. Gillis*, 372 F.3d 218, 230 (2004)). An

inmate's failure to comply with the procedural requirements of the prison's grievance system will result in the procedural default of the claim. *Spruill*, 372 F.3d at 227–32; *see also Williams*, 482 F.3d at 639 (inmate "procedurally defaulted" claim when he failed to comply with the requirements of the prison's grievance procedures). If the court concludes the plaintiff has failed to exhaust his available administrative remedies, the proper remedy is to dismiss without prejudice those portions of the complaint barred by section 1997e(a). *Jones*, 549 U.S. at 211 ("[U]nexhausted claims cannot be brought in court.")

Failure to exhaust is an affirmative defense that must be pleaded and proven by defendants. *Jones*, 549 U.S. at 212; *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002). Once defendants present evidence of a prisoner's failure to exhaust, the burden of proof shifts to the inmate to show that exhaustion occurred or that administrative remedies were unavailable. *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018). "Both the [United States] Supreme Court and [the Third Circuit Court of Appeals] have rejected judge-made exceptions to the PLRA." *Downey*, 968 F.3d at 305. District courts may not "excuse [a prisoner's] failure to exhaust." *Ross*, 136 S.Ct. at 1856 (rejecting a "special circumstance" exception). Likewise, district courts do not have the authority "to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." *Nyhius v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000). The PLRA, however, only

requires a prisoner exhaust those administrative remedies that are "available." 42 U.S.C. § 1997e(a); *Ross*, 136 S.Ct. at 1855. Where "an administrative remedy, although officially on the books," is "not capable of use to obtain relief," it is unavailable. *Rinaldi*, 904 F.3d at 266–67.

The Supreme Court has explained that an administrative remedy is considered "unavailable" when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S.Ct. at 1859–60. Similarly, the Third Circuit Court of Appeals has found an inmate's administrative remedy "unavailable" where prison officials provide "misleading or deceptive [filing] instructions," *see Hardy v. Shaikh*, 959 F.3d 578 (3d Cir. 2020), and when they fail to "timely (by its own procedural rules) respond to his grievance and then repeatedly ignored his follow-up requests for a decision on his claim." *Robinson v. Sup't Rockview SCI*, 831 F.3d 148, 154 (3d Cir. 2016) (state prison's administrative remedy process which did not contemplate an appeal from a non-decision thwarted the inmate's advancement of his claim through the appeal process); *see also Shifflett v. Korszniak*, 934 F.3d 356, 367 (3d Cir. 2019) ("[W]e hold that [the PLRA] requires strict compliance by prison officials with

13

their own policies.").  Further, where prison officials deter an inmate from pursuing an administrative remedy by making "serious threats of substantial retaliation … and bodily harm," the administrative remedy process is not "available."  *Rinaldi*, 904 F.3d at 267.  When considering exhaustion in the context of a motion for summary judgment, "a district court may not make credibility determinations or engage in any weighing of the evidence.  *See Paladino v. Newsom*, 885 F.3d 203, 209-10 (3d Cir. 2018).  "Rather, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor."  *Id.* at 210 (internal quotation marks omitted).

It is undisputed that Snead only properly exhausted one administrative remedy concerning the allegations of his lawsuit, AR913287, and that it only asserted allegations concerning Steif's actions on July 29, 2017.  Snead concedes he did not file any administrative claims concerning the alleged conduct of Defendants Finley, Perdue, Schreffler, Reisinger, Sensenig, Brown, and Connors.  (Doc. 61, ¶ 9; Doc. 69-1, ¶ 9.)  There is also no dispute that Snead failed to file an administrative claim concerning any alleged retaliatory acts against him.  (*See* Doc. 36, pp. 8, 24.)  As the Government Defendants have presented undisputed evidence of Snead's failure to exhaust his administrative remedies as to any claim against them, the burden of proof shifts to Snead to show that administrative remedies were unavailable to him.  *See Rinaldi*, 904 F.3d at 268.

14

The only exception to the PLRA's mandatory proper exhaustion requirement is if the inmate's administrative process was unavailable so as to excuse his non-compliance with administrative exhaustion. *Ross*, 136 S.Ct. at 1859–60. Here, Snead does not argue he did not understand the grievance process, or that it functioned as a dead end. Rather, Snead maintains: (1) that "[t]here was no time or window in which to exhaust his administrative remedies against anyone but Defendant Steif," Doc. 36, p. 24, and (2) that "defendants retaliated against [him] in an attempt to shut him up [as] the evidence clearly shows the close proximity of time [he] was retaliated against to his filing of the original complaint and amended complaint," (Doc. 69-1, pp. 6–7.) Snead's arguments are unpersuasive.

First, Snead argues there was insufficient time for him to file an administrative remedy concerning the Government Defendants' alleged failure to intervene or report Steif's actions immediately following the July 29, 2017 event. The court does not agree.

According to Snead, Sensenig witnessed Steif's actions on July 29, 2017. Brown "received a courtesy copy" of Snead's June 29, 2017 letter to the Inspector General concerning Steif's actions a month before Snead filed his remedy against Steif. (Doc. 69, p. 24; Doc. 69-1, p. 2.) Thus, to the extent Snead felt Sensenig and Brown "did nothing to protect him," Doc. 69-1, p. 2, Snead offers no plausible

explanation for not including them in his August 23, 2017 administrative remedy against Steif.

Equally faulty is Snead's argument that he should be excused from complying with the PLRA's exhaustion requirement because his claims against Steif were "life threatening" in nature. He asks the court to overlook his non-compliance with the exhaustion requirement as to the Government Defendants because it "would of [sic] taken too long to save someone from potential harms plaintiff is still left to face." (Doc. 69-1, p. 7.) This argument is incorrect as a matter of law and fact.

In fact, Snead had the option of filing an urgent or sensitive administrative remedy to shorten the administrative remedy process, but he did not and does not provide any explanation for not doing so. Furthermore, his "exigency" argument is undercut by his claim of the ongoing danger he "still [is] left to face." If the threat has continued since July 29, 2017, there is simply no logical or plausible explanation for failing to raise it via the administrative remedy process prior to May 9, 2019, when he filed his complaint or from failing to alert the prison of the ongoing nature of the "threat" as he perceived it, because he could have done so by a filing an expedited or sensitive administrative remedy.

Alternatively, the language of the only administrative remedy filed by Snead does not express any urgent concern for his safety from Steif, other inmates, or the

16

Government Defendants.  The relief Snead sought in his administrative remedy was that "M. Steif be terminated from the BOP so he cannot endanger anyone else."  (Doc. 61-1, 16.)  There is no evidence in the record that Snead ever requested to be separated from Steif, the inmates who heard Steif label him a snitch, or any Government Defendant due to concerns for his safety.  Similarly, Snead admits he was never physically harmed as a result of Steif's allegations and there is no evidence in the record to suggest Snead ever requested protective custody based on Steif's actions.  Thus, Snead has not demonstrated that the "life threatening" nature of his claims prevented him from filing an administrative remedy against the Government Defendants.

The court will next consider Snead's argument that he did not pursue additional administrative remedies against the Government Defendants because "defendants retaliated against [him] in an attempt to shut him up [as] the evidence clearly shows the close proximity of time [he] was retaliated against to his filing of the original complaint and amended complaint."  (Doc. 69-1, pp. 6–7.)  To demonstrate that the BOP's administrative remedy process was "unavailable" due to serious threats of substantial retaliation, Snead must show: (1) subjectively, that a Defendant's "threat did actually deter the plaintiff from lodging a grievance or pursuing a particular part of the process;" and (2) objectively, that "the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from

lodging a grievance or pursuing the part of the grievance process that the inmate failed to exhaust." *Rinaldi*, 904 F.3d at 268 (quoting *Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008)).

Snead fails to satisfy the second, objective component of the retaliation standard. The record supports the following findings. Snead and Steif remained in their respective positions, coexisting within the food service workplace, for at least a year following the July 29, 2017 incident and after Steif "apologized for disrespecting" Snead. (Doc. 36, p. 15.) Snead was removed from his food service job on September 19, 2019 and he was given another job. Snead had twenty days to file an administrative remedy concerning the alleged retaliatory loss of his job. During this time, he was not working with Steif or any Government Defendant. Snead had no expectation of being reassigned to food service at the time. Yet, Snead did not file an administrative remedy (traditional or sensitive) against any Defendant concerning the alleged retaliatory loss of his job. Moreover, it is important to note that the previous time Snead filed an administrative remedy concerning Steif, Warden Perdue advised him that his complaint was forwarded to OIA for investigation and that investigation sustained his allegations against Steif. Considering the context of the alleged intimidating or retaliatory acts asserted by Snead, he has not demonstrated that any prison official, let alone a Defendant, took any action that would chill an inmate of ordinary firmness from pursuing his

administrative remedies concerning his alleged retaliatory removal from his food service position on September 19, 2018 during the relevant window for him to file an administrative remedy.

The same holds true with respect to Snead's claim that his June 4, 2019 removal from his food service position was in retaliation "for continuing his process of his Administrative Remedies, and for this action." (Doc. 36, p. 17.) First, the timeline of events is not suggestive of retaliation as alleged by Snead. His only administrative remedy in this matter was resolved in November 2017. (Doc. 66-1, p. 9.) The OIA investigation sustaining his claims against Steif concluded on July 11, 2018. (Doc. 66, p. 1.) He commenced this action in May 2019, but it was not served upon Defendants until December 9, 2019. (Doc. 42.) All events that Snead alleges were triggers for the Defendants' retaliation, except for service of the amended complaint naming the Government Defendants, occurred and concluded prior to Snead being removed from his job in June 2019. Second, it is worth noting that even though Snead received a new job assignment after his June 2019 removal, he was regularly "called in to work in Food Service as a clerk position, but only after the hours that Defendant Snead is not at work."[7] (Doc. 36, p. 18.) This action demonstrates Government Defendants' intent to

---

[7] The court believes Snead made a typographical error in this averment and meant to refer to Defendant Steif rather than himself.

ameliorate any issues arising from Snead and Steif working together, it does not demonstrate their retaliation against him. Also, Snead admits he never declined a work assignment to the food service whether Steif, or any other Defendant, was present in his work area. Again, Snead had twenty days from his removal to file an administrative remedy (traditional or sensitive) if he believed his removal to be retaliatory or otherwise improper. Based on the above, the record does not support the conclusion that an inmate similarly situated to Snead would be deterred from filing an administrative remedy regarding his alleged retaliatory removal from his position or his claims against the Government Defendants.

Finally, contrary to Snead's suggestion, the court does not find the temporal proximity of his job removals, individually or collectively, when viewed in connection with his filing of his complaint or amended complaint as "evidence" of an implied retaliatory motive for his removal or use of the grievance process by any Defendant. (Doc. 69-1, pp. 6–7.) Snead is correct that sometimes a retaliatory motive can be inferred from either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing that suggest a causal link. *Balonga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 759 (3d Cir. 2019) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). However, for temporal proximity alone to show retaliatory motive, as Snead suggests here, the

time between the protected conduct and the adverse action is "measured in days, rather than in weeks or months, to suggest causation without corroborative evidence." *See Booze v. Wetzel*, No. 1:13-CV-2139, 2015 WL 5173937, at *15 (M.D. Pa. Sept. 2, 2015). "[A]lthough mere passage of time is not legally conclusive proof against retaliation," the Third Circuit Court of Appeals has held that "the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period." *Shainer v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000) (internal quotations and citation omitted); *see also Blakney v. City of Philadelphia*, 559 F. App'x 183, 185–86 (3d Cir. 2014) ("[W]here temporal proximity is not unduly suggestive, the appropriate test is timing plus other evidence." (internal citations omitted)); *see also Gulick v. City of Pittston*, 995 F. Supp.2d 322, 335–36 (M.D. Pa. 2014) (collecting cases affirming "unusually suggestive" time period is measured in days rather than weeks or months). Here, Snead relies exclusively on his subjective assertion that the timing of his removals reveals Defendants' retaliatory motive and threats to intimidate him from using the administrative remedy process. Based on the record before the court, no reasonable person would agree. The facts under examination are not sufficient to allow the court to infer that Defendants had a retaliatory motive.

Based on the above, Snead has failed to demonstrate that a reasonable inmate of ordinary firmness in the same situation would have failed to file administrative remedies against the Government Defendants. Accordingly, the Government Defendants are entitled to summary judgment in their favor based on Snead's failure to exhaust his available administrative remedies as to the claims asserted against them. Having reached that conclusion, the court will not address the Government Defendants' remaining arguments regarding sovereign immunity, personal involvement, and compensatory damages.

## CONCLUSION

For the foregoing reasons, the Government Defendants' motion for summary judgment is granted. An appropriate order follows.

s/ Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: July 6, 2021